UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MAREANDER HAGEDORN,

                Plaintiff,

v.

METLIFE, a foreign insurance company,

                Defendant.

No. C05-1083Z

ORDER

This matter comes before the Court on Plaintiff Mareander Hagedorn's ("Hagedorn") motion for summary judgment against Intervenor Plaintiff Dixie Brewster ("Brewster"). Docket no. 17.[1] Hagedorn moves the Court to enter judgment that she is entitled to the proceeds of a $420,000.00 life insurance policy owned by the decedent, Garrison Thomas ("Thomas"). Thomas died on April 7, 2004. Fricke Decl., docket no. 47, Ex. D (death certificate). From February 26, 2003, until the time of death, Thomas' employee life insurance policy designated Hagedorn as the named beneficiary of the policy.[2] Id., Ex. H.

---

[1] Defendant MetLife has been dismissed from this action after successfully moving to interplead the contested sum. Docket no. 39.

[2] The Court maintains subject matter jurisdiction over Plaintiff's claim pursuant to 29 U.S.C. § 1132(e)(1), as Thomas' insurance policy is governed by ERISA. Notice of Removal, docket no. 1.

ORDER 1−

1  Hagedorn claims that, as the named beneficiary, she is presently entitled to the proceeds of
2  the policy.  Brewster, who is Thomas' mother and the previously named beneficiary of the
3  policy, opposes the motion for summary judgment on the grounds that Hagedorn is precluded
4  from benefitting from the policy because Hagedorn was "involved in" Thomas' death.
5  Intervenor Pl.'s Opp., docket no. 44, at 1; Brewster Decl., docket no. 46, at 1.  Brewster
6  further contends that there is an issue of fact as to whether the beneficiary designation form
7  relied upon by Hagedorn has been forged or altered.  Id.  Having reviewed all of the briefing
8  and supporting declarations, the Court enters the following Order.

## BACKGROUND

Allegations that Hagedorn Caused Thomas' Death

Hagedorn states plainly that she "in no way caused or contributed to [Garrison Thomas'] death."  Hagedorn Aff., docket no. 18, at 2.  Hagedorn also states that Brewster's implications that she had something to do with Thomas' death are "false."  Id.  In her deposition, Hagedorn describes finding Thomas as follows:

> I was going to the gym to train a client, and on my way driving into town into the gym, I called [Thomas] at work to talk to him about a car rental and where he wanted me to meet him after work.  And they told me he had not shown up for work.  So I stopped by his house on the way to the gym.
> . . .
> I went in and his bedroom door was closed.  I opened the bedroom door.  I saw he was in bed.
> . . .
> It looked as if he was asleep.
> . . .
> He was sideways, lying on his side, as I recall.  I believe he was on his – lying on his right side.
> . . .
> I believe I called his name several times, and then I walked to the side of the bed.  I think I called his name and – I think I touched him.  He was very cold.
> . . .
> I used the phone, I believe, next to the bed and called 911.

Fricke Decl, Ex. G, at 19-20.

The Whatcom County Medical Examiner, Gary Goldfogel, M.D. ("Goldfogel"), who performed the autopsy on Thomas, labeled his cause of death "[a]cute poly prescription drug

ORDER  2–

overdose/poisoning." Id., Ex E, at 2. Thomas' autopsy indicated that he had the following drugs in his system at the time of death: oxycodone, meprobamate, carisoprodol, zolpidem, citalopram, and chlorpheniramine. Id., Exs. A and B. The report also indicated that Thomas had anabolic steroids in his system. Id. Ex. A. Goldfogel states that Thomas had "an enlarged heart, small testicles and other findings consistent with habitual use of steroids" and that Goldfogel is "of the opinion that the decedent used anabolic steroids for an extended period of time and that his use of these drugs was with his knowledge and participation." Goldfogel Decl., docket no. 48, at 2. Goldfogel also states that prescriptions for six of the seven drugs found in Thomas' system had been written for Thomas by his treating physicians. Id. A search of Thomas' computer by the Bellingham Police Department revealed that "[s]everal pieces of data were located on Garrison Thomas' [] computer that indicated that he either purchased his prescribed medication over the Internet on a regular basis or visited several online pharmacy websites that sold his prescription medication." Fricke Decl., Ex. C, at 3.

In response to Hagedorn's statement that she did not cause or contribute to Thomas' death, Brewster contends that there is a disputed issue of fact as to whether that statement is true. Brewster relies primarily on beliefs held by her and Thomas' sister, Charlene Johnson ("Johnson"), that Thomas would not willingly take the drugs in his system. Brewster states that Thomas "had a dislike for prescription medications" and "often refused to take medications instead choosing to rely upon his own inner strength to heal himself." Brewster Decl., at 1. Brewster also states that Thomas "often told [her] how illegal drugs were destructive" and "how he hated steroids." Id. Finally, Brewster states that she "finds it incredibly suspicious that prescription and illegal drugs were found in [Thomas'] system after he died." Id., at 2. Similarly, Johnson states that Thomas "did not like to take any drugs, even those that were prescribed to him" and that "he would not willingly take any

ORDER 3–

1  drugs." Johnson Decl., docket no. 45, at 2. Johnson also states that Thomas "never took
2  illegal drugs and abhorred those who did." Id.
3       Brewster also contends that there is evidence that Hagedorn had a motive to cause
4  Thomas' death because, at the time, she was receiving $11,000 per month in maintenance
5  payments that were scheduled to end approximately two years and eight months later, on
6  December 15, 2006. Fricke Decl., Ex F (Hagedorn's Modified Decree of Dissolution).[3]
7  Brewster intimates that Hagedorn was motivated to kill Thomas for the insurance proceeds
8  because she would have been unable to maintain her lifestyle after the maintenance payments
9  ended 32 months later. Brewster also states that Hagedorn had access to Thomas' home
10 because she had a key and knew the access code to the garage. Id., Ex. G (Hagedorn Dep. at
11 19-20). This fact is undisputed.
12      Finally, Brewster seems to suggest that the relationship between Thomas and
13 Hagedorn was suspicious because Hagedorn claims that they were engaged but neither
14 Brewster nor Johnson had ever met Hagedorn. Brewster Decl., at 2; Johnson Decl., at 1.
15 Brewster states that "it would be inconceivable for Gary Thomas to consider marrying Ms.
16 Hagedorn without first discussing the matter with me and introducing me to her." Id.
17 Additionally, Johnson states that Thomas was "precluded . . . from dating Mrs. Hagedorn"
18 because he "was a homosexual." Johnson Decl., at 1.
19 <u>Allegations that the Beneficiary Designation is Altered or Forged</u>
20      Brewster contends that there is evidence that the "Designation of Beneficiary" section
21 of the "Enrollment Form" for Thomas' life insurance policy has been altered. Brewster
22 maintains that "[t]he beneficiary form supplied to the parties is a photocopy. The photocopy
23 clearly shows some evidence of alteration." Intervenor Pl.'s Opp., at 5 (citing Fricke Decl.,

---

25 [3] In Brewster's opposition brief, she states that the maintenance payments were scheduled to end on "December 15, 2005." Intervenor Pl.'s Opp., at 4. However, the Decree of
26 Dissolution modification filed in Whatcom County Superior Court identifies the date only as "December 2006." Fricke Decl., Ex. F at 1-2.

ORDER  4–

1   Ex H (Enrollment Form photocopy)).  Brewster "advocates that the altered sections are an

2   attempt to obscure another beneficiary name" and that this raises an issue of fact for the jury.

3   Id. at 10.  The Enrollment Form listing Hagedorn as the beneficiary was received by MetLife

4   Group Life Center on March 5, 2003, which was approximately 13 months before Thomas'

5   death.  Belcher Aff., docket no. 51, Ex. A.  During the investigation into Thomas' death,

6   Brewster acknowledged that the signature on the Form was in fact Thomas' when speaking

7   to the Bellingham Police Department.  Goldfogel Decl., at 10.  Additionally, Hagedorn has

8   submitted the declaration of Ronald Parks, one of Thomas' co-workers, who states that

9   Thomas had "mentioned" that Hagedorn was the beneficiary on his employee life insurance

10  policy.  Parks Decl., docket no. 49, at 2.

## DISCUSSION

12  Summary judgment is appropriate where there is no genuine issue of material fact and

13  the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The

14  moving party bears the initial burden of demonstrating the absence of a genuine issue of

15  material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party

16  has met this burden, the opposing party must show that there is a genuine issue of fact for

17  trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The

18  opposing party must present significant and probative evidence to support its claim or

19  defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir.

20  1991).  For purposes of this motion, reasonable doubts as to the existence of material facts

21  are resolved against the moving parties and inferences are drawn in the light most favorable

22  to the opposing party.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

23  **I.    Brewster's Allegation that Hagedorn Participated in Thomas' Death**

24  Hagedorn contends that the Court should enter judgment that she is entitled to the

25  proceeds of Thomas' life insurance policy because Brewster has not raised a genuine issue of

26  fact concerning her possible "involvement" in Thomas' death.  Pl.'s Mot., docket no. 17, at

ORDER  5–

2. Brewster contends that, based on the facts alleged above, there is a contested issue as to whether Hagedorn "had anything to do with [Thomas'] death." Intervenor Pl.'s Opp., at 9. Citing both state and federal law, Brewster argues that it is undisputed that Hagedorn cannot collect as a beneficiary if she was involved in Thomas' death. Id. at 7.

Brewster relies on both the Washington State slayer statute and federal cases suggesting that a person may not benefit from a life insurance policy if the person intentionally causes the decedent's death. The slayer statute appears in RCW 11.84.020, which states that "[n]o slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but such property shall pass as provided in the sections following." A "slayer" is defined as "any person who participates, either as a principal or an accessory before the fact, in the *willful and unlawful killing* of any other person." RCW 11.84.010(1) (emphasis added). Additionally, RCW 11.84.100 states that "[i]nsurance proceeds payable to the slayer as the beneficiary or assignee of any policy or certificate of insurance on the life of the decedent, or as the survivor of a joint life policy, shall be paid instead to the estate of the decedent . . . ." The burden of proving that the killing was "willful" and "unlawful" is on the party seeking the benefit of the statute. Cook v. Gisler, 20 Wn. App. 677, 683 (1978).

In her opening brief, Hagedorn contends that the Washington State slayer statute does not apply in this case because it is preempted by ERISA. Hagedorn relies on Egelhoff v. Egelhoff, 532 U.S. 141 (2001), and Ahmed v. Ahmed, 158 Ohio App.3d 527 (2004). In Egelhoff, the United States Supreme Court held that Washington State's statute that automatically revoked the designation of a spouse as a non-probate beneficiary upon divorce was preempted by ERISA. 532 U.S. at 148-50. In Ahmed, the Ohio Court of Appeals questioned whether ERISA preempted Ohio's slayer statute after the Egelhoff decision. 158 Ohio App.3d at 534-36. Concluding that the diversity of slayer statutes throughout the United States interfered with the "nationally uniform plan administration" of ERISA, the

ORDER  6–

Ahmed Court held that ERISA preempted Ohio's statute. Id. at 536. As a result, the Ahmed Court concluded that it was required to apply federal common law, which contains its own version of the prohibition on a slayer recovering proceeds from decedents. Id. at 537.

Without directly responding to the question of ERISA preemption of the Washington State slayer statute, Brewster appears to argue that the issue is irrelevant because the federal common rule regarding slayers imposes a similar standard. The federal Slayer's Rule holds that "a beneficiary who has *wrongfully caused* the death of an insured forfeits his right to the insurance proceeds." Metro. Life Ins. Co. v. Kelley, 890 F. Supp. 746 (N.D. Ill. 1995) (emphasis added) (citing Mut. Life Ins. Co. of N.Y. v. Armstrong, 117 U.S. 591, 600 (1886) ("It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of the party whose life he had *feloniously taken*." (Emphasis added))).

This Court's determination of whether or not ERISA preempts the Washington State slayer statute is not dispositive in this case because the federal Slayer Rule is substantively identical. Washington State requires the challenger (i.e., Brewster) to demonstrate that the beneficiary "participat[ed]" in the "wilful and unlawful killing" of the decedent. RCW 11.84.010(1). Similarly, the federal Slayer Rule requires a showing that the beneficiary "wrongfully caused" the decedents' death or, stated another way, that the decedents' life was "feloniously taken" by the beneficiary. Metro Life, 890 F. Supp. at 746; Mut. Life, 117 U.S. at 600. Hagedorn appears to concede this point, arguing in her reply brief only that Brewster has not provided sufficient evidence to raise an issue of fact under either standard. Pl.'s Reply, docket no. 52, at 1-2.

**A.     Insufficient Facts to Support Inference that Hagedorn Killed Thomas**

Because Hagedorn has filed an affidavit stating that she "in no way caused or contributed to" Thomas' death, the burden shifts to Brewster to provide "significant and probative evidence" demonstrating that there is an issue of fact as to whether Hagedorn

ORDER   7–

wrongfully caused, or was a wilful participant in, the unlawful or felonious killing of Thomas. Hagedorn Aff., at 2; <u>Intel</u>, 952 F.2d at 1558. Given the record before the Court, Brewster has failed to establish that such an issue exists. First, Brewster has offered no evidence that Thomas' death was "wrongfully caused" or the result of an "unlawful killing." <u>See</u> RCW 11.84.010(1). To the contrary, Hagedorn has provided the only evidence as to this element in the Goldfogel declaration, who states that "it cannot be determined whether this was a suicide, an accidental overdose or a homicide." Goldfogel Decl., at 2. In the autopsy report, Goldfogel stated that the "death is unnatural and further characterization of manner is not ascertainable to the 'more probable than not' standard." <u>Id.</u> To establish that Hagedorn falls within the definition of a "slayer" under either the federal common law or Washington State slayer statute, Brewster ultimately must prove that Thomas' death was "wrongfully caused" or the result of an "unlawful killing." Brewster has failed to raise any issue of fact which would preclude summary judgment.

Second, even if Brewster could establish that Thomas' death was wrongfully caused or the result of an unlawful killing, there is no evidence to conclude that Hagedorn was the one who "wrongfully caused" his death or participated "as a principal or an accessory before the fact" in his death. <u>See</u> RCW 11.84.010(1). Brewster's arguments are based on the following: (1) Brewster and Johnson state that Thomas told them that he was against using prescription or illegal drugs; (2) Thomas died with multiple prescription drugs and anabolic steroids in his system; and, therefore, (3) an inference may be drawn that Hagedorn was involved with Thomas' death because she had access to his home and had a motive to kill him for the insurance money. Setting aside that many of the alleged statements by Thomas concerning drug use are inadmissible hearsay, Brewster's logic is both flawed and contradicted by the undisputed facts. Despite Thomas' alleged statements to the contrary, Thomas had obtained valid prescriptions from his treating physician for six of the seven drugs found in his system. The police found evidence that he ordered one or more of these

ORDER 8−

drugs on his computer over the internet, and the autopsy revealed that the state of Thomas' body was consistent with the intentional use of anabolic steroids for an extended period of time. The allegation that Hagedorn had a motive to kill Thomas because she was the named beneficiary on the policy does not create an issue of fact, as it would be true of any beneficiary of any life insurance policy. And the suggestion that Hagedorn had a motive to kill Thomas' because her $11,000 per month maintenance payments were scheduled to end two years and eight months after Thomas' death can only be characterized as unsupported speculation. In sum, Brewster has not provided any basis to raise an issue of fact as to whether Hagedorn, or anyone else, participated in wrongfully causing the death of Thomas.

## II.     Alteration of the Enrollment Form Beneficiary Designation

In addition to arguing that there is an issue of fact as to whether Hagedorn is a "slayer" under either state or federal law, Brewster argues that there is an issue as to whether the Enrollment Form of Thomas' life insurance policy has been altered. Brewster contends: "There is no doubt based upon the photocopies of the beneficiary form that the documents have been altered. Whether or not Ms. Hagedorn is the legitimate beneficiary of this insurance policy is an issue of material fact because it is dispositive on this case." Intervenor Pl.'s Opp., at 10. Brewster argues that the issue to be resolved is "which parts of the document were altered." Id. For the reasons that follow, this argument is without merit.

First, Brewster's "altered document" argument is notable for what it lacks. Even assuming that a jury were to conclude that the document was altered as Brewster contends, there is no evidence or allegation that it was altered by someone other than Thomas. Nor is there any evidence or allegation by a handwriting expert, or anyone else, that the writing on the document is in someone's hand other than Thomas'. Brewster does not provide any evidence or allegation that, if the document was altered, it was done without his consent; indeed, it is undisputed that Thomas' signature is on the form. Thus, even if the jury were to

ORDER  9–

resolve the "disputed fact" of whether the Enrollment Form has been altered in favor of Brewster, she would not be entitled to judgment in her favor on that basis alone.

Second, all of the evidence in the record before the Court indicates that Hagedorn was in fact named as the beneficiary on the policy by Thomas. The form was filed with MetLife over one year before Thomas' death and there is no evidence that the original was altered after that date or that it was in the possession of anyone other than MetLife. The signature on the Enrollment Form is indisputably that of Thomas. Moreover, Hagedorn has submitted the Parks declaration, stating that Thomas mentioned listing Hagedorn as a beneficiary on the insurance policy before his death. In sum, Brewster has not provided any evidence in support of her contention that Thomas' insurance policy Enrollment Form is invalid.

## CONCLUSION

Intervenor Plaintiff Brewster has failed to raise a genuine issue of material fact as to her contention that Plaintiff Hagedorn wrongfully caused or participated in the unlawful killing of Thomas, or that the insurance policy Enrollment Form is invalid because it was improperly altered. Accordingly, Hagedorn's motion for summary judgment, docket no. 17, is GRANTED.

The Clerk is directed to enter judgment awarding Plaintiff Hagedorn the proceeds of MetLife Insurance Policy No. 0095520, currently on deposit in the registry of the Court, plus all accrued interest, minus any statutory user fees, pursuant to Local Rule GR 6. The judgment shall also dismiss the claim of Intervenor Plaintiff Dixie Brewster with prejudice. Once the judgment has been entered, Plaintiff Hagedorn shall file a motion and proposed order for disbursement of funds pursuant to Local Rule GR 6(b).

ORDER 10–

1       IT IS SO ORDERED.

2       DATED this 27th day of April, 2006.

                                                        Thomas S. Zilly
                                                        United States District Judge

ORDER  11−